The next case on today's docket is the case of people of the state of Illinois v. David Warren. We have Ms. Arden Lange for the appellant and we have Ms. Rebecca McCormick for the appellee and you may proceed when you're prepared to do so. Ms. Lange May it please the court, Mr. McCormick, my name is Arden Lange. I'm with the Office of the State Appellate Defender in Springfield, Illinois. I represent David Warren who seeks redress from his 2001 conviction and sentence for first degree murder. Mr. Warren is in prison today based almost entirely but with some corroboration, based on DNA testing that was done before his 2001 trial and when this court looked at the evidence against Mr. Warren on direct appeal, this court had the job of deciding whether the trial was fair, whether the jury verdict was supported by the evidence and this court found that it did. And Mr. Warren is not quibbling with your decision on direct appeal. But the focus of this appeal is quite different because Mr. Warren, with the aid of section 116.3, is requesting forensic testing of his DNA if possible with the aim not of showing that his trial was unfair but with the aim of trying to prove his innocence. And with that in mind, I'd like to begin by saying that when this section 116.3 petition was filed, it was before Judge Eckert. And she did grant Mr. Warren some limited relief. She ruled that Mr. Warren could have an expert look at the petition and look at what was being requested. And to see if there was a scientific basis for going further. And with that in mind, the case proceeded on and on. And I think due to Judge Eckert's retirement, but I'm not sure because the record is silent on that, in that regard, the case was reassigned. And eventually the case wound up before a different judge. And there was a hearing, a short hearing, and the judge ruled against Mr. Warren and that ruling is what is before the court today. Mr. Warren is asking for testing of the screwdriver tip. And that is where the DNA that identified him was found. And it was believed in 2001 at trial that all of the DNA had been consumed. And therefore, when an expert came in at trial for the defense, Jamie Harmon, and testified that she believed that further testing might show that it wasn't his DNA because there was only a very small sample that could be taken. And nothing could really be done about it. So this court's job was to look at that evidence and say, well, we have this evidence and no further testing can be done. And that was that. And the jury believed that the DNA did belong to Mr. Warren. Today there are tests available. And I don't want to play what I think of as an alphabet game with the court. I am not a scientific expert. I have attempted in my brief, in my reply brief, to discuss the tests available. But the question really before the court is, given that the defense expert who was the expert at trial and now has been asked by defense counsel at the Section 163 hearing to look at what was available, given that that expert has said that she believed that further testing could be done to determine if DNA thought destroyed in 2001 might actually be able to be extracted and analyzed with new methods, and given that there are new tests available, that she believed that further testing could be done and that it could be that Mr. Warren might be exonerated. Now this is a testing of what was left on the swab after it was taken off the screwdriver tip. There are three parts to, I guess, what is left and available for testing. There's the screwdriver tip. There's the swab. And then there's the stick, I believe. But there's a cloth, a stick, and the screwdriver tip, any one of which might have DNA material left over. Oh, just the stick that holds the swab are you talking about? Yeah, yeah. But I, okay. Okay. And that has been retained. They have been retained. The state has not suggested that there's been tainting of the swab. The state does say, and the state did not quarrel with the fact that a primatization case had been made that the chain of custody had been maintained, nor did the state argue at any point that identity wasn't the sole issue in this case. But is the forensic material available? They think that there may be, there's additional forensic material that might be available in the, if I'm understanding your question. Yeah. There's also a sexual assault which was taken, and although there's no proof that the victim was sexually assaulted during the offense, there were fingernail scrapings taken and never examined. Those might yield a different... So they were taken as part of the sexual assault, but you would use it for a different purpose? Yes. Because if you think about it, you know... For being attacked and trying to save their lives. Exactly. They might reveal that she had contact with... But that would have been at a different time? No, no. Oh, at the same time. Okay. Right. I mean, the sexual assault kit was taken upon death. Okay. As part of the autopsy. So that's there. And then we don't know, the expert said she wouldn't know until she examined the screwdriver and the swab under lab conditions. Can I ask you, and I should know this maybe, but the fingernail scrapings, were they examined? No. So they never were? No. Because apparently, I don't know the... Maybe they would have been had no DNA been found. I don't know. But they decided there was no reason to examine them. Right. So they are available, apparently. No one is... But it's not that we have new and better testing that wasn't available then with respect to the fingernail scrapings? No. But that no testing had been done on those. So we have some evidence where no testing had been done, and then other potential evidence where testing was done. And as was discussed at length at trial and then in the briefs here. Because there was such a small amount of DNA found, 0.88 nanograms, apparently one to two nanograms at the time was the gold standard. The, you know, testing was very small. So now, you know, the hope would be with new kits that there would be a way of testing. The state... In my brief, I suggested some of the state's arguments are forfeited. But in terms of the actual argument of the state... Sorry. Sorry, you're trying to... I was trying to address this. Thank you. You have her bottle. Thank you. I'm sorry. Ms. McCormick? Your Honors, counsel. The defendant's motion for forensic testing was dismissed on the people's motion below. This court will conduct a de novo review of the correctness of that decision. The people below were willing to stipulate and agree that identity was at issue and that the items that the defendant wanted to test were subject to a chain test. So there was a prima facie case made. At that point, the court had to then look at whether the result of the testing has the potential, scientific potential, to produce new non-cumulative evidence materially relevant to the defendant's claim of actual innocence and that the testing employs a scientific method generally accepted within the relevant scientific community. This testing had to have not been available at the time of the defendant's trial in 2001. Now, at the defendant's trial, there was DNA testing by the PCR-STR method, short tandem repeat method. The evidence was presented about profiles found on the screwdriver tip and the handle of the screwdriver. Charisma Thomas, who was the murder victim, kept that screwdriver with her for self-defense. She was bludgeoned to death. It was a really bloody crime. At the autopsy, there were fingernail scrapings taken. Although there was no evidence of a sexual assault, they did a sexual assault kit. Those things were available for testing. Now, at the trial, there was evidence about a swab taken of the tip of the screwdriver. And there was a very, very small sample available. And even with PCR, that's replication of the DNA on there, the sample was still so small that they could only test nine points. But this was sufficient to identify, and the defendant's DNA profile matched all nine of those loci. The test that was used was the profiler test. This is a PCR-STR test. The defendant's expert at trial testified that perhaps if a different PCR test, the profiler, had been used, it might have excluded the defendant. But on rebuttal, the state's expert testified that it was virtually impossible that the profiler would have had a different result because the defendant's profile matched all nine of the loci tested. Now, the jury also knew that an unidentified profile was found in this as well. And this unidentified profile, to this day, as far as I know, remains unidentified. But the jury had the information that there was another DNA profile on there besides the victims and besides the defendants. So the jury had this information to weigh. Now, at this point in time, the defendant files a motion for DNA testing, for new forensic testing. He requested specific tests, the identifiler or the minifiler. Now, these are also PCR-STR tests. The identifiler test was available at the time of trial. So he hasn't shown that that is a test that he could not have performed on the remaining forensic material that exists then and exists now. So, you know, he fails to show that there was a scientific test that was unavailable to him. Now, as to the swab, that was available. Now, let me explain. I'm going to back up and explain. The swab took the blood off of the tip. And then the DNA was extracted from the swab. The swab remains. And, you know, whether there's any DNA test, any DNA left on that to test is a mystery. But it was subjected to the very same kind of PCR-STR test that the defendant is wanting now. So is it going to produce a different result? You know, even assuming there's DNA left on that swab, it's still going to produce, at most, an unidentified profile. The defendant's profile and the victim's profile. The blood on the handle that was tested. I thought that was her blood, they said, on the handle. Yeah, on the handle. I'm talking about the tip. The swab is right there. Right. I understand the tip. But you got the handle. I thought that was not even a question. Right. The handle just had her blood. Her blood. Right. Exactly. Now, after the forensic samples were taken for DNA testing, the screwdriver itself was then subjected to fingerprint analysis. And it's very likely it's quite contaminated. Although, there's a chain of custody, then, you know, it's... But my understanding, there's only one DNA that was found on the handle. That was hers. There wasn't more. There wasn't an unknown or another. Right. Okay. Now, as to the... And this evidence wasn't presented at trial, but, you know, in the rape kit, there was also an unidentified profile. But the salient point is that the defendant has to show that he's requesting a forensic test that was not available at the time of trial. And that has a reasonable likelihood. And the test that he requested before the trial court was identifier and minifier. Now, for the first time on appeal, he wants YSTR testing, and he mentions mitochondrial testing. Now, this wasn't in... And the judge never considered and was never asked to consider whether this kind of testing would be more probative. Also, on appeal, he fails to show that YSTR testing is generally accepted within the scientific community and is admissible. And as far as, you know, up to the date that I wrote the brief, there were no Illinois cases that admitted YSTR testing. Now, what is YSTR testing? What is mitochondrial testing? Of the double sets of genes that we get from our parents, we get an X and a Y. And two Xs results in a female, generally. And XY results in a male. And what the YSTR testing does, it tests the Y chromosome at certain loci. But as far as I know, the CODIS database does not include YSTR testing. So it's not going to have the scientific potential to produce something that's going to be probative of innocence. Even if it's... Because there's nothing to compare it to. If there's nothing to compare it to, all you have is an unknown DNA profile. And this... The fact that there was an unknown DNA profile on the very tip of the screwdriver, which is, you know, the defensive part that she would have been using, that evidence was before the jury. What are we going to get now? At most, even, you know, even if this court should grant YSTR or mitochondrial testing, which the defendant never requested below, at most what we're going to get is another... I mean, an unknown. And the jury already considered that fact. And so, you know, what potential do we have to... Even accepting his argument to show that there's a reasonable likelihood that, you know, it's going to produce some kind of evidence that's exonerating. It's just not fair. But the salient point is that the test that he was requesting in his motion for forensic testing, the identifier, was available in 2001. We know from the testimony in the trial transcript that co-filer, which is another STR test, was available. And the swab was available. If it could have been tested then with the co-filer, why wasn't it? It was another STR test. All this was available at the time. So he's failed to show that there's a test that wasn't available that he should have. Thank you, Justice McCormick. Ms. Lange, rebuttal. What is your answer that all these tests were available at the time of trial? Some tests were available. Which ones weren't? Which ones weren't? Any test which would have narrowed in and been able to deal with a much smaller sample than was available in 2001. The tests are more sensitive today, and they hone in on smaller amounts of DNA. The STR tests, which are in kits now, are different than they were in 2001. Yes, there was a co-filer test. Now there is a mini-filer test, which was not available back then. And the tests are now run together in a way that allows for more DNA, as I understand it, and more loci can be located because the tests work together. So it's not just the alphabet, but the sophistication of the individual kits within the alphabet. Can't we say that about fingerprinting? Electronically? That it's more? It's better. Could be. But here we're dealing with the one element which links Mr. Warren to this crime because there was no motive. There was no eyewitness. There was no confession. If this evidence could yield a DNA profile, it might help to exonerate him because if the sample is bigger and using new tests, we don't know what that profile will show. And there were anomalies way back when, when the material was initially tested. So the fact that there might be an unlikelihood of a match is not what 116.3 tells us. 116.3 tells us that if there's potential for advancing the defendant's cause, the defendant is not required to prove his innocence. And I think that he has met the burden under 116.3, and he would ask that this court reverse the judgment of the trial court and send it back in order to allow testing. Thank you. Thank you, Ms. Lane. Thank you, Ms. McCormick, for your arguments and briefs. And we'll take a matter of minutes. This court now stands in recess.